UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>v.<br><br>Christian DeMarco Thomas,<br><br>　　　　Defendant. | Case No. 2:22-cr-00129-GMN-DJA<br><br>**REPORT AND RECOMMENDATION**<br><br>[ECF No. 33] |

　　While on routine patrol late one evening, Las Vegas Metropolitan Police Department (LVMPD) Officer Michael Chatterton (Chatterton) observed a vehicle driving in either a distracted or impaired manner, which vehicle returned as possibly stolen after Chatterton conducted a record check. Chatterton stopped the vehicle and temporarily detained the driver, defendant Christian Thomas (Thomas). After confirming the vehicle was stolen and the owner wished to pick it up, other responding officers conducted a search of the vehicle which they described as an inventory search in anticipation of releasing the car to the owner. During this search officers discovered a firearm with an extended magazine underneath the driver's side seat. Upon hearing this, Thomas began adjusting his waistband which led officers to conduct a pat down search resulting in a second magazine dropping to the ground. Upon learning Thomas was a prohibited person, officers arrested Thomas and he was subsequently charged with possession of the firearm and magazine. Thomas now moves to suppress the weapon and magazine, alleging that the search of the vehicle and his person violated his constitutional rights. Because I find that the evidence was observed during a lawful search of the car and Thomas' person, I deny his motion to suppress.

## BACKGROUND

　　Thomas is charged in an Amended Criminal Indictment with one count of Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and one count of

1  Felon in Possession of Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (ECF
2  No. 17). Thomas filed a motion to suppress evidence of the firearm on December 15, 2022.
3  (ECF No. 33). The Government filed a response in opposition to the motion on January 12, 2023.
4  (ECF No. 36). Thomas filed a reply on February 3, 2023. (ECF No. 41).
5       I conducted an evidentiary hearing on the motion on March 1, 2023. (Mins. of
6  Proceedings (ECF No. 47)). The government called two witnesses to testify: Chatterton, and
7  Officer Victor Hernandez, who also responded to the scene. The defense called Officer Cody
8  Suey, another responding officer. The parties submitted 12 exhibits, including all the body worn
9  cameras of the responding officers. After hearing arguments, I ordered the parties to file
10 simultaneous supplemental briefs focusing on Thomas' standing to contest the search, why the
11 officers were justified searching the car and the good faith exception for the officers' mistakes in
12 their report. I indicated that I would issue a written Report & Recommendation after considering
13 the supplements. The parties timely filed their supplements. (ECF Nos. 57, 58) on April 12,
14 2023. This report and recommendation follows.

**TESTIMONY AND EVIDENCE**

16      On April 21, 2022, LVMPD Patrol Officer Chatterton was working the swing shift alone
17 in a marked patrol vehicle wearing a body camera. At approximately 11:15 p.m. a Ford Taurus in
18 front of Chatterton caught his attention because it was "ping-ponging back and forth in it's lane,"
19 a sign of possible impaired or distracted driving. Upon observing this, Chatterton activated his
20 body camera and ran a DMV registration check on the Taurus. A hit returned indicating the car
21 was registered to a Brandon Knowles and was possibly stolen. "Possibly stolen" meant the car
22 had been reported stolen but no officer followed up with an interview of the individual who
23 reported it stolen nor submitted a subsequent report. Chatterton continued to follow the vehicle to
24 see more signs of possible impairment.
25      After Chatterton followed the vehicle for a period, it stopped and pulled into a residential
26 driveway in what Chatterton described as a high crime area. Chatterton activated his lights and
27 advised dispatch that he was preparing to preform a high-risk vehicle stop and take the driver
28

1  "into custody." Chatterton exited his vehicle and stood next to its doorframe issuing commands
2  to the driver as he exited the Taurus. The driver was later identified as defendant Thomas.

3      Chatterton testified that "into custody" did not mean that he immediately arrested Thomas.
4  Rather, he handcuffed Thomas for his safety because the vehicle was spotted in a high crime
5  neighborhood that was poorly lit, the vehicle was not cleared of other passengers, the vehicle was
6  possibly stolen, Thomas was not following Chatterton's commands as to where he should stand,
7  and Chatterton was still the only officer on scene. Chatterton told Thomas upon inquiry that he
8  was handcuffing him because the vehicle was possibly stolen.

9      During a subsequent pat down search of Thomas, Chatterton felt a "large rectangular
10 bulge" in Thomas' left pocket. When Chatterton touched that part of Thomas, Thomas said
11 "phone." Chatterton did not further search that pocket. Later, when discussing his phone,
12 Thomas stated his phone was in the vehicle. Thomas referenced his phone being in the car after
13 suggesting that Chatterton could call the owner of the vehicle, whom Thomas referred to as
14 "Jenni—Tiffany."

15     After obtaining Thomas' name and date of birth, Chatterton continued to question Thomas
16 to determine if he was lawfully in possession of the vehicle or if it was stolen. Thomas next
17 stated that he rented the vehicle through Turo, a car rental application and that he rented it two
18 days earlier. At this time two additional patrol officers arrived and conducted a "protective
19 sweep" of the vehicle to "clear" the vehicle of other people. No other people or incriminating
20 evidence were discovered.

21     Chatterton testified that while this sweep was occurring, Thomas was not listening to
22 commands about where to stand and repeatedly turned his back on Chatterton to look at the
23 vehicle. This indicated to Chatterton that Thomas was concerned with something in the vehicle
24 or was still impaired such that he could not understand the instructions.

25     While clearing the vehicle, Chatterton asked for the keys so they could open the trunk to
26 ensure no one was in there. Thomas refused to give them to officers. This concerned Chatterton.
27 After this, when questioned further regarding the name of the person who owned the vehicle,
28 Thomas claimed not to know. This inconsistency caused Chatterton to think Thomas was making

up a story about who the vehicle was rented from, and that Thomas was not legally in possession of the vehicle.

Once the vehicle was cleared, Chatterton re-entered his vehicle to confirm with DMV the information on the Taurus being reported stolen was correct. Chatterton confirmed the vehicle was reported stolen and was informed by dispatch that the reported owner wished to retrieve the vehicle. Chatterton testified that per LVMPD policy, once the owner wants to retrieve the vehicle, officers preform an inventory search of the vehicle to list the property found in the vehicle before it is returned.

With this new information, Chatterton continued to question Thomas as to how he obtained the vehicle. Chatterton suggested Thomas show him on the phone app the information regarding the rental. During this time other officers were beginning the inventory search and Thomas was more focused on the vehicle than providing Chatterton with rental information from his app. Thomas also changed his story again and claimed that the vehicle was rented an hour before the stop by his "baby's momma" from someone at a Siegel's Suites. When pressed why he stopped at the residence where the investigation was occurring, Thomas stated he was delivering food to the residence through Door Dash. That was never confirmed.

Nearly simultaneous to this, officers conducting the inventory stated they found a weapon under the driver's seat. Upon hearing this, Thomas adjusted his waistband which concerned the officers. They immediately conducted another pat-down search of Thomas during which time a magazine dropped to the ground. Chatterton ran a record check on Thomas and determined he was a prohibited person with multiple felony convictions.

Thomas was formally arrested and placed in the back seat of the patrol car. Shortly after, Thomas experienced a medical emergency which he indicated likely was caused by his ingesting two fentanyl pills earlier in the evening. Thomas was thereafter transported to the hospital for medical treatment.

**LEGAL STANDARDS AND ANALYSIS**

**1.    Fourth Amendment**

The Fourth Amendment addresses "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." *U.S. Const. Amend. IV*. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *See Katz v. United States*, 389 U.S. 347, 352-53 (1967). It protects "people, not places," and extends to brief investigatory stops of persons or vehicles that fall short of traditional arrests. *Id.* at 351; *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1020 (9th Cir. 2009) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Evidence obtained in violation of the Fourth Amendment and evidence derived from it may be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). However, the Fourth Amendment is satisfied if the officer's actions are supported by a reasonable suspicion. *Arvizu*, 534 U.S. at 273.

**2.    Standing**

The Government argues that Thomas did not meet his burden and therefore lacks standing to challenge the search. It argues that Thomas did not own the vehicle; the vehicle was reported possibly stolen; Thomas was aware he was not in legal possession of the vehicle because he made contradictory statements as to how he came into possession of the vehicle and never provided proof he lawfully rented it; and there were numerous personal items in the vehicle that did not appear to belong to Thomas, including the birth certificate of another person, all belying Thomas' claim that he had rented the vehicle. Thomas counters that the vehicle was only listed as possibly stolen and its status was never confirmed; Thomas claimed from the beginning of his encounter with law enforcement that he had lawfully rented the vehicle; there was no indicia that the vehicle was stolen such as a broken ignition, defaced VIN, or evidence of burglary tools; and Thomas had the keys to the vehicle. Given this and the fact that Thomas was in possession of the vehicle, Thomas argues he has met his burden to show he had an expectation of privacy and therefore standing to contest the search.

It is axiomatic that an individual seeking to exclude evidence allegedly obtained in violation of the Fourth Amendment must have standing to challenge the illegal conduct that led to

the discovery of the evidence. *United States v. Pulliam*, 405 F.3d 782, 785-786 (9th Cir. 2005) (citing *Rakas v. Illinois*, 439 U.S. 128, 134 (1978)) (finding defendant did not have standing to challenge the search of a car in which he was a passenger and seizure of the gun found in the car did not violate his Fourth Amendment rights). The proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated by the challenged search or seizure. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005) (citation omitted) (finding defendant failed to show he had reasonable expectation of privacy in laptop seized by police). "To invoke the protections of the Fourth Amendment, a person must show he had a 'legitimate expectation of privacy.'" *United States v. Nerber*, 222 F.3d 597, 599 (9th Cir. 2000). To establish a legitimate expectation of privacy a person must show (1) a subjective expectation of privacy (2) that society is prepared to recognize as objectively reasonable. *Id*. (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979).

  Generally, a person does not possess a reasonable expectation of privacy in a vehicle in which he has no lawful ownership or possessory interest. *Rakas*, 439 U.S. at 148-149 (noting a passenger who asserts neither a possessory nor property interest in a vehicle does not have a legitimate expectation of privacy in the vehicle); *see also United States v. Thomas*, 447 F.3d 1191, 1199 (9th Cir. 2006) (finding unauthorized driver had no privacy interest in a rental car). Even so, "possessory or ownership interests" are not narrowly defined. *Thomas*, 447 F.3d at 1197. "A reasonable expectation of privacy may be shown 'either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Id*. (quoting *Rakas*, 439 U.S. at 142 n. 12). Thus, even though a defendant may lack an ownership interest, he may have standing to challenge a search upon showing "joint control" or "common authority." *Id*. at 1198. In *Thomas*, the Ninth Circuit stated that "[c]ommon authority rests 'on mutual use of the property by persons generally having joint access or control for most purposes.'" *Id*. (quoting *Illinois v. Rodriquez*, 496 U.S. 177 (1990)). For example, in *United States v. Portillo*, 633 F.2d 1313, 1317 (9th Cir. 1980), the Ninth Circuit held that the defendant who was driving the vehicle with the owner's permission had standing to challenge the propriety of the search of the trunk.

I find that Thomas has established standing, albeit barely, to challenge the search of the vehicle. There is no dispute that the vehicle was listed as possibly stolen, and there were absolutely no indicia that the vehicle was stolen such as a broken steering column or otherwise rigged ignition (in fact, Thomas had the keys), a defaced VIN, or burglary tools inside that would suggest Thomas did not have permission to posses the vehicle. Additionally, Thomas maintained from the outset that he had rented the vehicle. While he made several contradictory statements regarding the circumstances of the rental, that does not rise to the level of knowledge that the vehicle was stolen, especially when investigating officers acknowledged that Thomas could have unwittingly rented the vehicle from someone on the Turo app not knowing that person had stolen the car. Given these facts, Thomas has established that he had a reasonable expectation of privacy that would permit his Fourth Amendment challenge to the search of the vehicle.

### 3. **Inventory search**

As a general rule, the government must obtain a warrant based on probable cause in order to conduct a search, but there are exceptions to this requirement. *See Mitchell v. Wisconsin*, -- U.S. --, 139 S. Ct. 2525, 2534 (2019). The Supreme Court evaluates the reasonableness of a warrantless search "by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979). An inventory search is a "well-defined exception to the warrant requirement." *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983).

"Once a vehicle has been legally impounded, the police may conduct an inventory search, as long as it conforms to the standard procedures of the local police department." *United States v. Cervantes*, 703 F.3d 1135, 1141 (2012) (citations omitted). In the context of an inventory search, the individual's privacy interest is protected by routine administrative procedures that limit an officer's discretion in conducting the search. *See Prouse*, 440 U.S. at 655; *see also Lafayette*, 462 U.S. at 648 (holding that a warrantless search of an arrestee's person and effects incident to booking the arrestee is reasonable when it is "part of the routine procedure incident to incarcerating an arrested person"). Even if the officers have some discretion in conducting an inventory search, the search remains reasonable "so long as that discretion is exercised according

to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Colorado v. Bertine*, 479 U.S. 367, 375 (1987).

For purposes of the Fourth Amendment's reasonableness test, the issue is whether the inventory search is pretextual, not whether it fails to achieve full compliance with the administrative procedures. *United States v. Anderson*, 56 F.4th 748, 758 (2022). "[R]easonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment," even if the police implementation of standardized inventorying procedure is "somewhat slipshod." *Bertine*, 479 U.S. at 369, at 374. For instance, *Bertine* upheld the validity of an inventory search even though the officer "failed to list $150 in cash found in respondent's wallet or the contents of a sealed envelope marked 'rent,' $210, in the relevant section of the property form," made "no reference to other items of value, including respondent's credit cards, and a converter, a hydraulic jack, and a set of tire chains, worth a total of $125," failed to list the "$700 in cash found in respondent's backpack, along with the contraband," among other failings. *Id.* at 383 (Marshall, J., dissenting). The Ninth Circuit has adopted the principle that "administrative errors should not, on their own, invalidate inventory searches: 'There must be something else; something to suggest the police raised "the inventory-search banner in an after-the-fact attempt to justify" a simple investigatory search for incriminating evidence.'" *United States v. Garay*, 938 F.3d 1108, 1112 (9th Cir. 2019) (citations omitted). The failure to complete an inventory form or "other comparable administrative errors" does not invalidate the search if there is no evidence that the "the officers were rummaging for evidence." *Id.* at 1111–12.

Moreover, an "otherwise reasonable inventory search" is not invalid merely because the police have a mixed motive for the search. *See id.* at 1112–13. When an inventory search would have occurred in the absence of a motive to search for evidence of a crime, "the mere presence of a criminal investigatory motive or dual motive—one valid, and one impermissible—does not render an [inventory] search invalid." *United States v. Magdirila*, 962 F.3d 1152, 1157 (9th Cir. 2020) (cleaned up). So long as the police did not act "in bad faith or for the *sole* purpose of investigation," an inventory search is valid. *Bertine*, 479 U.S. at 372, 107 S.Ct. 738 (emphasis added).

1    I find that the inventory search of the vehicle here was valid. Although officers did not impound the vehicle, they performed an inventory search in conformance with their standard procedures for vehicle theft recoveries. Those procedures required officers to work with the department to notify the victim—in this case, the registered owner of the car—and to allow the victim to pick up the car at the recovery location. Understanding that the registered owner of the vehicle was on his way to pick up the car, the officers filled out LVMPD Form 503—the vehicle recovery report—as required by LVMPD Policy 4.120, governing vehicle theft recoveries. That form included a section for an inventory of the car and Officer Chatterton testified that, officers were expected to fill out the entire form and if not, would be subject to reprimand. (ECF No. 49 at 33). Not only was conducting an inventory prior to returning a car to its registered owner required by LVMPD policy, as Officer Chatterton testified, it served the commonsense purpose of protecting LVMPD from liability, protecting Thomas' property, and protecting the community from releasing a car back to an owner with dangerous items inside. (ECF No. 50 at 74-76). This is sufficient for me to find that the officers conducted the inventory search according to standard criteria—in preparation for releasing the car to the registered owner—rather than on the basis of suspicion of criminal activity.

This is true even though the search failed to achieve full compliance with the procedures. Thomas points out that the officer who filled out LVMPD Form 503 made certain mistakes like checking both the "impound" and "vehicle recovery" boxes when only one should be checked, failing to list all items in the car, checking both yes and no in the box asking whether the vehicle was returned to the owner, and crossing out the name of the registered owner in the box asking to whom officers released the vehicle. But I note that the latter two deficiencies were caused because the registered owner initially informed officers that he would be able to pick up the car, but later informed them that he could not. The officers thus had to change the form to indicate that the car would be towed instead. And the officer who filled out the form testified that he had mistakenly checked the "impound" box after learning that the registered owner would not be picking up the vehicle. Additionally, just because the report contained inventory errors does not, on its own, invalidate the inventory search. I do not otherwise find that the police raised the

"inventory-search banner" after the fact to justify the search or to cover up a rummage for evidence. And even if the officers did intend to search for evidence of a crime, I find that their testimony demonstrates that they had the valid motive of preparing the vehicle to be picked up by the registered owner as required by LVMPD policy. I thus find that the inventory search was valid and that the firearm found during that search should not be suppressed.

### 4. *Terry* stop and frisk requirements and the exclusionary rule

In *Terry v. Ohio*, the Supreme Court held that an officer may briefly stop individuals for investigative purposes if the officer has a reasonable suspicion that the individual is engaged in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). The officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. *Id.* at 21. Determining whether the officer's "specific and articulable facts" constitute reasonable suspicion requires an objective, totality-of-the-circumstances evaluation. *Id.* at 21-22.

"[H]andcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop. *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982). On the other hand, police conducting on-the-scene investigations involving potentially dangerous suspects may take precautionary measures if they are reasonably necessary. *Id.* A brief but complete restriction of liberty, if not excessive under the circumstances, is permissible during a *Terry* stop and does not necessarily convert the stop into an arrest. *Id.* A limited protective sweep of a suspect's vehicle is also permissible during a *Terry* stop "if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983).

But a *Terry* stop does not automatically entitle the officer to perform a *Terry* frisk—also called a pat down—of the stopped individual. *See Terry*, 392 U.S. at 23-24. An officer may only perform a *Terry* frisk if he "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous." *Id.* at 24. The stop and the

frisk are thus two independent intrusions into the individual's privacy, so the officer must have an independent, reasonable suspicion to justify each act. *See Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016). "A mere inchoate and unparticularized suspicion or hunch that a person is armed and dangerous does not establish reasonable suspicion, and circumstances suggesting only that a suspect would be dangerous *if* armed are insufficient. There must be adequate reason to believe the suspect is armed." *Id.* (internal quotations and citations omitted) (emphasis in original). "Importantly, reasonable suspicion must be individualized: even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Id.* at 877 (internal quotation and citations omitted).

Evidence obtained from an illegal *Terry* frisk must be suppressed under the exclusionary rule. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (evidence seized during an unlawful search "cannot constitute proof against the victim of the search"). "[T]he exclusionary rule extends beyond evidence directly obtained in violation of the Fourth Amendment to the 'fruit of the poisonous tree.'" *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989). Thus, if the court finds that either the *Terry* stop or the *Terry* frisk was not supported by reasonable suspicion, then the court must exclude the fruits of the illegal search, in this case, the weapon found on Thomas' person during the frisk.

### a. The officer's *Terry* stop was supported by reasonable suspicion

Chatterton's initial stop of Thomas was justified under *Terry v. Ohio* because Chatterton had a reasonable suspicion that Thomas was engaged in criminal activity. Chatterton was able to point to specific and articulable facts which reasonably warranted him stopping Thomas. Specifically, the Taurus Thomas was driving initially caught Chatterton's attention because it was "ping-ponging back and forth in its lane," which is a sign of possible impaired or distracted driving. When Chatterton ran a DMV registration check on the car, a hit returned that the car was possibly stolen.

Additionally, I find that Chatterton handcuffing Thomas did not convert the *Terry* stop into an arrest. Chatterton explained that he employed the handcuffs as a protective measure

because, after Chatterton signaled, the vehicle pulled into a driveway in a place Chatterton described as a high crime area with poor lighting. Chatterton was alone, had learned that the vehicle was possibly stolen, and had not yet cleared the vehicle of other passengers. Thomas was also not following Chatterton's commands. The officers' protective sweep of the vehicle also did not result in any evidence, so I do not analyze it's appropriateness further for the purposes of this motion to suppress. Given Chatterton's ability to point to specific and articulable facts creating reasonable suspicion that Mr. Thomas was engaged in criminal activity, I find that Chatterton's initial *Terry* stop was reasonable.

### b.  Officers' *Terry* frisk was supported by reasonable suspicion.

The officers' *Terry* frisk was also supported by reasonable suspicion. Immediately after officers discovered the firearm in the vehicle, Thomas began moving his hands around his waistband, leading the officers to believe that he might be armed. Thomas' actions in reaching for his waistband were also preceded by officers learning that the vehicle was possibly stolen, Thomas' repeated turning to look at the vehicle, Thomas' inconsistent answers about who rented the vehicle to him, and Thomas' inconsistent answers about where his phone was located after telling officers that it was in his pocket. Together with Thomas' movements following officers' discovery of a firearm during their inventory of the car, these facts constitute adequate reason for officers to believe that Thomas was armed. I thus find that the *Terry* frisk was supported by reasonable suspicion.

### 5.  Inevitable discovery

The inevitable discovery doctrine acts as an exception to the exclusionary rule and permits the admission of otherwise excluded evidence "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police…" *U.S. v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000) (citing *Nix v. Williams*, 467 U.S. 431, 447 (1984)). The government must make this showing by a preponderance of the evidence. *Id.*

Here, I find that the Government has met its burden of showing that it would have inevitably obtained both the firearm in the vehicle and the magazine on Thomas' person. Given

the fact that the vehicle was listed as possibly stolen, that officers were able to contact the registered owner, and that Thomas gave inconsistent answers about the individual from whom he rented it, officers would not have released the car back to Thomas. The registered owner also explained that he was unable to pick up the vehicle and that his insurance company told him to have it towed. Because the registered owner was ultimately unable to pick up the car and because officers would not have released the car back to Thomas, they inevitably would have impounded the car and done an inventory search under LVMPD's impound policy. And during that inventory search, officers would have discovered the firearm in the vehicle.

Similarly, officers would have discovered the magazine on Thomas' person. While the Government's arguments on this point are less strong than their arguments regarding the firearm, I nonetheless find that the Government has met its burden. As the Government points out, even if officers did not arrest Thomas for possessing a firearm, they testified that they would have arrested him for possession of a stolen vehicle. Indeed, Thomas was unable to produce evidence that he had rented the car during officers' investigation and gave inconsistent answers about the individual from whom he rented the car.

Even if officers did not ultimately arrest Thomas for possession of a stolen vehicle, Thomas eventually experienced a medical emergency due to fentanyl consumption requiring hospitalization and officers would have discovered the magazine during a search prior to Thomas' transport to the hospital. Thomas argues that, had officers not found the firearm, the stop would not have been prolonged to the point that officers discovered his fentanyl consumption. But the officers were nonetheless still determining the vehicle's ownership during the stop and confirming when the registered owner would arrive. This means that, even if officers did not ultimately arrest Thomas for possession of a stolen vehicle, the stop would have continued for at least some time beyond when officers found the firearm. Moreover, I have already determined that the Government has met its burden of demonstrating that the officers would have inevitably found the firearm, which finding would have led officers to arrest Thomas and conduct a search incident to that arrest. I thus find that the Government has met its burden of showing that the firearm in the car and the magazine on Thomas' person would have inevitably been found.

### 6. Good faith exception

"The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right," and that "[w]here the official action was pursued in complete good faith ... the deterrence rationale loses much of its force." *United States v. Leon*, 468 U.S. 897, 919 (1984). In such cases, "excluding the evidence will not further the ends of the exclusionary rule in any appreciable way." *Id.* at 920 (quoting *Stone v. Powell*, 428 U.S. 465, 539–40 (1976)). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. U.S.*, 555 U.S. 135, 144 (2009).

Here, I find that the officers conducted the inventory search of the vehicle and the pat down search of Thomas in good faith such that any deterrence rationale would lose its force if applied to this scenario. Given the fact that Chatterton witnessed Thomas swerving and then determined that the car was reported stolen, I find that Chatterton pulled Thomas over in good faith as part of his investigation into whether Thomas was under the influence and whether the vehicle was stolen. Because officers anticipated that the registered owner would pick up the vehicle, they followed LVMPD policy in good faith to prepare the vehicle to be picked up. Although officers ultimately did not strictly follow that policy given their mistakes on the inventory form, I do not find their mistakes to have been malicious or intended to obscure bad faith motives. Additionally, after officers found the firearm in the vehicle, they witnessed Thomas moving his hands around his waist and I find that officers acted in good faith in patting him down for weapons. I thus find that, even if the evidence obtained from the inventory and from patting Thomas down were excludable, it would fall under the good faith exception.

///

///

///

**CONCLUSION AND RECOMMENDATON**

IT IS THEREFORE RECOMMENDED that Thomas' Motion to Suppress Evidence (ECF No. 33) be DENIED.

**NOTICE**

This report and recommendation is submitted to the United States District Judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: June 26, 2023

_____
DANIEL J. ALBREGTS
UNITED STATES MAGISTRATE JUDGE